**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

CASSANDRA R. CREDIT, §
§
       Plaintiff, §
§
vs. §     CIVIL ACTION NO. 10-1074
§
MICHAEL ASTRUE, Commissioner §
of the Social Security Administration, §
§
       Defendant. §

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by Judge Lee H. Rosenthal, for full pretrial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Cassandra R. Credit ("Plaintiff," "Credit"), and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment and Memorandum in Support of Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #21; Defendant's Cross-Motion for Summary Judgment and Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #15). Each party has filed a response to the competing motion. (Plaintiff's Response to Defendant's Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #23; Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry #22). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Defendant's motion be GRANTED, and that Plaintiff's motion be DENIED.

## Background

On July 12, 2006, Plaintiff Cassandra Credit filed an application for Supplemental Security Income ("SSI") benefits, under Title XVI of the of the Social Security Act ("the Act"). (Transcript ["Tr."] at 120). In her application, Plaintiff claimed that she had been unable to work since March 3, 2006, when she was injured in an automobile accident. (Tr. at 123). She claimed that her injuries resulted in "seizures" and "brain surgery."[1] (*Id.*). She later complained of pain and weakness on her left side, hypertension, insomnia, depression, and anxiety. (*See*, *e.g.*, Tr. at 17, 24, 89, 112). On August 30, 2006, the SSA denied her application for benefits, finding that she was not disabled under the Act. (Tr. at 23). Plaintiff petitioned for a reconsideration of that decision, but her claim was again denied. (Tr. at 24).

On March 23, 2007, Plaintiff requested a hearing before an administrative law judge. (Tr. at 83). The hearing took place on September 4, 2008, before ALJ William Howard. (Tr. at 308). Plaintiff appeared with her attorney, Donald Dewberry ("Dewberry"), and she testified in her own behalf. (*Id.*). The ALJ also heard testimony from Cecile Johnson ("Johnson"), a vocational expert. (*Id.*). Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Credit was capable of performing substantial gainful activity or was, in fact, disabled:

> 1.      An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

> 2.      An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

---

[1] The "brain surgery" Plaintiff referred to was a procedure in which a pooling of blood in her brain "was drained by the bedside with a twist drill," as described by the attending physician. (Tr. at 273).

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  It is well-settled that, under this analysis, the claimant has the burden to prove any disability that is relevant to the first four steps.  *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "'A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.'"  *Randall v. Astrue*, 570 F.3d 651, 652 (5th Cir. 2009) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)); *accord Audler*, 501 F.3d at 448.

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability.  *See Perez*, 415 F.3d at 461; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  A person is disabled only if she is "'unable to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Randall*, 570 F.3d at 653 (quoting 42 U.S.C. § 1382c(a)(3)(A)); *accord Perez*, 415 F.3d at 461.  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Id*.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Randall*, 570 F.3d at 657 (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that she "'is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work'" which exists in the national economy.  *Id*. (quoting 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence, the ALJ determined that Credit suffers from a "status post head injury resulting from an automobile accident," "depression, not otherwise specified ["NOS"]," and an "anxiety disorder," and that those impairments are "severe."  (Tr. at 17).   He concluded, however, that none of Credit's impairments, or any combination of impairments, meets, or equals in severity, the medical criteria for any disabling impairment listed in the applicable SSA regulations.  (*Id*.).  Next, the ALJ found that Credit had the residual functional capacity ("RFC") to perform work requiring a "light" level of exertion, with additional restrictions regarding interaction with co-workers and hazardous conditions.  (Tr. at 19). Drawing from the evidence, the ALJ found that Credit had no past relevant work experience, but that she was capable of performing jobs that exist in significant numbers in the local and national economies.  (Tr. at 21).  With that finding, the ALJ concluded that Credit had not been "under a disability, as defined in the Social Security Act, since July 12, 2006, the date the application was

filed," and denied her application for benefits.  (Tr. at 22).

Plaintiff then requested a review of the ALJ's decision.  (Tr. at 10).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470. On January 21, 2010, the Appeals Council denied her request, finding that no applicable reason for review existed.  (Tr. at 3).  With this ruling, the ALJ's decision became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On March 26, 2010, Credit filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the Commissioner's decision.  (Docket Entry #1). Subsequently, the parties filed cross-motions for summary judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.*  "'Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support

a conclusion.'" *Randall*, 570 F.3d at 662 (*quoting Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992)); *accord Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).   On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Randall*, 570 F.3d at 662; *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126.   If there are no credible evidentiary choices or medical findings that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

**Discussion**

Before this court, Plaintiff contends that the ALJ erred for a number of reasons.  (Plaintiff's Motion at 5-8).  She claims, first, that the ALJ erred because he failed to give proper weight to the psychological and neuropsychological assessment performed by the consulting psychologist. (*Id*.). Next, she complains that the ALJ erred because he failed to take into account her mental limitations and memory deficits, both in determining her RFC, and in posing hypothetical questions to the vocational expert witness. (*Id*.).  Credit contends, as well, that the ALJ erred because he "failed to make severity findings on all of Plaintiff's impairments," and, in particular, her diabetes.  (*Id*.). Defendant insists, however, that the ALJ properly considered all of the available and relevant evidence, and followed the applicable law, in determining that Credit is not disabled.  (Defendant's

Response at 1-8).

### *Medical Facts, Opinions, and Diagnoses*

The earliest relevant medical records show that, on September 25, 2005, Credit went to the emergency room of Methodist Willowbrook Hospital, complaining of neck, back, and left thigh pain. (Tr. at 146). Credit reported that the pain was the result of a piece of sheet rock falling on her back and left thigh after a tree fell on her roof during Hurricane Rita. (*Id.*). She was admitted to the hospital and treated by Dr. Michael Cantu ("Dr. Cantu"), a specialist in emergency medicine. (Tr. at 137-40). Dr. Cantu ordered a series of tests to evaluate Plaintiff's condition. (*Id.*). The results of an MRI of Credit's cervical spine showed the following:

> The neck is leaning towards the right while the head is angled towards the left. There is straightening of the cervical lordosis.[2] ... The oblique films demonstrate good C7-T1 alignment at the level of the facet joint. There is no evidence of acute fracture. There is mild retrolisthesis[3] at C5-6 associated with ossification[4] within the anterior disk margin and minimum dorsal spondylosis."[5]

(Tr. at 137). An MRI of her lumbar spine showed "mild compression fractures," but "no evidence of acute fracture or dislocation." (Tr. at 138). An MRI of Credit's dorsal spine revealed that she suffered from "mild scoliosis,[6] convex towards the right." (Tr. at 140). An x-ray taken of Credit's left femur showed that her "[b]ones and joints [were] intact." (Tr. at 139). Dr. Cantu diagnosed

---

[2] The term "lordosis" means "bent forward," and refers to "an abnormal anterior concavity of the lumbar part of the back." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 957 (5th ed. 1998).

[3] The term "retrolisthesis" refers to a " backward slippage of one vertebra onto the vertebra immediately below." THE FREE DICTIONARY, *http://medical-dictionary.thefreedictionary.com*.

[4] "Ossification" is "the development of bone." MOSBY'S at 1164.

[5] "Spondylosis" is defined as a "stiffening or fixation of [the vertebra] as the result of a disease process." STEDMAN'S MEDICAL DICTIONARY 1678 (27th ed. 2000).

[6] "Scoliosis" is a "lateral curvature of the spine." MOSBY'S at 1460.

7

Plaintiff as suffering from "back, thigh contusion[s]."[7]  (Tr. at 141).  He recommended over-the-counter Advil and rest.  (*Id*.).  He also prescribed Lortab, a pain medication, to take "if needed." (*Id*.).

Because of continued back and neck pain, in October 2005, Credit sought follow-up treatment from Dr. Ermic Kenneth Gaston ("Dr. Gaston"), a specialist in emergency medicine.  (Tr. at 148-52).  At the initial appointment, Dr. Gaston diagnosed Credit as suffering from lumbar, dorsal, knee, thigh, and shin contusions.  (Tr. at 152).  He referred her for "treat[ment] with physical therapy consisting of ultrasound, elec stem, hot/cold pack, massage and range of motion exercise, five time[s] a week for two week[s]."  (*Id*.).  Credit returned to Dr. Gaston twice in November 2005, and he recommended that she continue physical therapy, three times a week.  (Tr. at 150-51).  On December 2, 2005, Dr. Gaston increased the frequency of physical therapy to five times a week, and he also prescribed medications to ease her insomnia and anxiety.  (Tr. at 149).  On February 1, 2006, Credit's last appointment with Dr. Gaston, he noted that she was still complaining of pain, at the level of "7/10."  (Tr. at 148).  He also noted Credit's report of insomnia and "continued headaches and anxiety."  (*Id*.).  Dr. Gaston stated that, in his opinion, Credit would not benefit from "additional conservative treatments, therefore [he would] not re-start her on physical therapy."  (*Id*.).  He also stated, "However, in view of her complaints of pain, discomfort and anxiety, I would recommend that she be seen by a neurologist.  (*Id*.).

On March 3, 2006, Credit was taken by ambulance to the emergency room at The Methodist Hospital after she was involved in an automobile accident.  (Tr. at 322).  The hospital records show

---

[7] A "contusion" is "any mechanical injury (usually caused by a blow) resulting in hemorrhage beneath unbroken skin."  STEDMAN'S at 406.

that she had suffered "blunt trauma to the head."  (*Id*).  She was admitted to the hospital, and was treated by Dr. Jeffrey Kalina ("Dr. Kalina"), a specialist in emergency medicine.  (*Id*.).  Dr. Kalina ordered a series of radiological tests, which were performed on March 4, 2006.  (Tr. at 155-58).  A CT scan of Credit's brain revealed "a large left frontal scalp hematoma."[8]  (Tr. at 156).  Otherwise, it showed no signs of any of the following:  "underlying . . . foreign body or fracture"; "acute intracranial hemorrhage, mass, hydrocephalus, or midline shift"; or an "acute abnormality" of "the visualized portions of the orbits."  (*Id*.).  An x-ray and CT scans of Credit's cervical spine showed "mild cervicothoracic scoliosis convex towards the right," but "no definite evidence of acute fracture or dislocation within the visualized regions."  (Tr. at 155, 157-58).

From March 8, 2006, through June 5, 2006, Credit obtained physical therapy at the Atlas Healthcare Clinic, to treat her neck and back pain.  (Tr. at 160-83).  Although she reportedly did benefit from the physical therapy, it did not relieve all of her symptoms.  (*See id*.).  At her last visit, Credit was said to be suffering from "moderate pain intensity of upper extremities with mild hypersensitivity when applying deep palpitation."  (Tr. at 161).

On June 25, 2006, Plaintiff went to Ben Taub General Hospital, after suffering a seizure. (Tr. at 269, 272).  She was admitted, and was treated by Dr. Shankar Gopinath ("Dr. Gopinath"), a neurosurgeon.  (Tr. at 273).  A CT scan of Credit's head revealed "[m]ultifocal chronic encephalomalacia."[9]  (Tr. at 232).  On the report of the scan, the radiologist noted that "[s]mall chronic subdurals cannot be excluded."  (*Id*.).  On June 26, 2006, another CT scan was taken, and

---

[8] A "hematoma" is "a localized mass of extravasated blood that is relatively or completely confined within an organ or tissue, a space, or a potential space; the blood is usually clotted (or partially clotted) and, depending on how long it has been there, may manifest various degrees or organization and decolorization."  *Id*. at 796.

[9] The term "encephalomalacia" refers to a softening or sponginess of the brain.  *See* MOSBY'S at 557, 979.

it revealed hematomas on both sides of the brain and bleeding in the left lobe, as follows:

> IMPRESSION: There are bilateral frontoparietal subdural hematomas, left larger than right, that are mostly isodense to brain parenchyma.[10] On the left side maximum thickness is approximately 1.4 cm. On the right side the thickness is approximately 0.6 cm. The midline is displaced to the right about 4 mm. Since the previous exam, there is a small amount of fresh blood in the left frontal subdural. No parenchymal abnormality is seen.

(Tr. at 230). A third CT scan of Plaintiff's head was performed June 29, 2006. (Tr. at 228-29). The results were interpreted, as follows:

> 1.      No interval change from previous 305 exam in bilateral frontoparietal subdural hematomas. Left hematoma measures 1.4 cm and right hematoma measures 0.7 cm. The majority of the hematomas are isodense to the brain parenchyma with no change in bilateral small amounts of acute/subacute hemorrhage.

> 2.      No change in left to right midline shift measuring 4 mm.

> 3.      No other intracranial abnormalities.

(Tr. at 229). A drainage catheter was then placed in the left hematoma. (Tr. at 227-28, 273). A CT scan, taken on July 2, 2006, showed that the drainage catheter had significantly decreased the size of the left hematoma. (Tr. at 227). The scan also revealed, however, that there "ha[d] been continued evolution of the right parietal subdural blood, not with a fluid-fluid level, measuring 6mm." (*Id*.). On July 3, 2006, Dr. Gopinath summarized Plaintiff's treatment during her eight-day hospital stay, as follows:

> A CAT scan revealed a chronic subdermal hematoma which was drained by the bedside with a twist drill set on July 2, 2006. The follow-up CT showed a complete resolution of the subdural hematoma. The drain was then removed. Throughout her hospital course, the patient had episodes of nausea and vomiting which resolved after the subdural hematoma drainage. The patient will be discharged with antiseizure medicine, blood pressure and diabetes medications.

---

[10] The term "parenchyma" refers to "the functional tissue of an organ as distinguished from supporting or connective tissue." *Id*. at 1207.

(*Id.*).  The doctor discharged her in "good" condition, with a recommendation to go to an emergency room if she experienced any more seizures.  (*Id.*).  At a follow-up appointment on July 14, 2006, Credit's stitches were removed, and she was reported to be "doing well."  (Tr. at 186).  The attending physician "[r]eminded her that she needs to take [seizure medications] until all refills run out.  (*Id.*).

On January 5, 2007, Dr. Walter Buell ("Dr. Buell"), a neurologist, evaluated Credit, on behalf of the state.  (Tr. at 208).  In assessing her residual functional capacity, Dr. Buell made the following comments:

> DO observations indicate no problem understanding or concentrating.  Able to read without difficulty noted.  No problem with vision and able to use hands without limitations.  DO also notes she had no difficulty answering questions.  Neat appearance and normal behavior.

(Tr. at 209).  Dr. Buell also noted that Credit claimed to suffer from "blurred vision," but that she "can see well enough to read the newspaper" and "to use public transportation."  (Tr. at 210).  Dr. Buell determined that Credit could occasionally lift or carry items weighing 50 pounds, and frequently lift 25-pound items.  (Tr. at 209).  He found that she could sit, stand, or walk for six hours in an eight-hour workday.  (*Id.*).  He also found that, because of her history of a seizure disorder, Credit could never climb a ladder or rope, but she could occasionally climb stairs or ramps.  (Tr. at 210).  Dr. Buell stated that Plaintiff could frequently stoop, kneel, crouch, and crawl.  (*Id.*).  Dr. Buell found that Credit had no manipulative, visual, or communicative limitations.  (Tr. at 211-12). He found, however, that Credit should avoid  "moderate exposure" to hazards such as machinery, heights, and open flames.  (Tr. at 212).  Finally, he concluded that her "alleged limitations are partially supported by [the evidence of record]."  (Tr. at 213).

The next medical records show that, in May and June 2008, Dr. Mohammed Zare ("Dr. Zare"), a family practitioner, treated Plaintiff for hypertension, type II diabetes mellitus[11] without complications, and obesity.  (Tr. at 275).  Dr. Zare also referred Credit to Klair Latino ("Ms. Latino"), a licensed social worker, for mental health treatment.  (Tr. at 276).  Ms. Latino noted that Credit complained of the following symptoms:

> Sad affect, crying spells, body aches, forgetful, not able to concentrate, head hurts, hard to sleep due to pain, fatigue constantly, lack of energy, lack of motivation, denies [suicidal ideations].
>                          *   *   *
> Worries often, possible panic attacks, chest pain, [shortness of breath].

(*Id.*).  Ms. Latino diagnosed Plaintiff as suffering from a "major depressive disorder," and she gave her a Global Assessment of Functioning ("GAF") score of 55.[12]  (Tr. at 276-77).  Ms. Latino recommended counseling, and she suggested that Credit be evaluated for "medication - an antidepressant." at her next visit with Dr. Zare.  (Tr. at 277).

At the hearing, the ALJ ordered an internal medicine examination for a second opinion on Credit's RFC.  (Tr. at 336-37).  That examination, by Dr. Daryl Daniel ("Dr. Daniel"), an internist, took place on November 6, 2008.  (Tr. at 279-87).  Dr. Daniel cited Credit's chief complaints as "seizure disorder," "essential hypertension," "drainage of SDH (subdural hematoma)."  (Tr. at 279).  He also reported that Credit claimed to continue to suffer "seizure activity" despite her medications,

---

[11] "Diabetes mellitus" is "a complex disorder of carbohydrate, fat, and protein metabolism that is primarily a result of a deficiency or complete lack of insulin secretion by the beta cells of the pancreas or of defects of the insulin receptors." *Id*. at 477.

[12] The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id*.  A GAF score of 51-60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.* at 34.

and that, "after her seizures, she feels confused and weak." (*Id.*). He further noted that Credit's

medical records show that she suffers from hypertension and diabetes. (Tr. at 280). Dr. Daniel

stated that Credit "describe[d] occasional chest pain with shortness of breath and headache as well

as blurry vision." (*Id.*). On a worksheet, Dr. Daniel stated that Credit can read, except for "very

small print." (Tr. at 285). Following his examination, Dr. Daniel diagnosed Credit as suffering from

a "[h]istory of seizure disorder (poorly controlled by history)," "[e]ssential hypertension," and a

"[h]istory of drainage of a subdural hematoma with subsequent seizure activity as a result." (Tr. at

281). He concluded, as follows:

> Her overall functional capacity on today's physical examination does not appear to
> be affected. She should operate no heavy equipment or use sharp objects given her
> history of seizure activity and a poorly controlled state of the condition. Her overall
> functional and physical capacity otherwise is not severely infected [sic] based on
> today's physical examination and historical information provided.

(*Id.*).

At the hearing, the ALJ also ordered a mental health evaluation of Credit, to include a series

of psychological tests. (Tr. at 336-37). The evaluation, which took place on November 10, 2008,

was performed by Dr. Cecilia Lonnecker ("Dr. Lonnecker"), a psychologist. (Tr. at 288). In her

report, Dr. Lonnecker stated that Plaintiff provided her own history "with what appeared to be fair

reliability." (*Id.*). Dr. Lonnecker reported that Credit described her typical daily activities, as

follows:

> . . . she is able to prepare herself something to eat and is able to go shopping
> independently. She rarely drives, sometimes rides public transportation. She is able
> to care for her personal hygiene and grooming needs independently.

(Tr. at 289). She also pointed to Credit's "reports [that her] social functioning is limited but

adequate." (*Id.*). She further noted that Credit alleged "difficulties completing tasks timely and

13

appropriately," and ascribed this difficulty to "concentration problems, fatigue, [and] loss of interest." (*Id.*). Following her initial examination, Dr. Lonnecker found that Credit was alert; that her "[s]peech was within normal limits"; that her "[t]hought processes were coherent, logical, [and] relevant"; and that she was "fully oriented." (Tr. at 290). She stated that Plaintiff reported that she "was depressed and anxious," and found that her "[a]ffect was mood congruent." She further observed that Credit "was periodically tearful throughout the examination session." (*Id.*). She found Plaintiff's judgment and insight to be within the "low average range." (Tr. at 291). Dr. Lonnecker assessed Plaintiff's intelligence quotient ("IQ")[13] using the Wechsler Adult Intelligence-III ("WAIS-III") Test.[14] (Tr. at 291-92). The results of that test showed that Plaintiff's verbal IQ score was 80, that her performance IQ score was 77, and that her full scale IQ score was 77. (*Id.*). Based on the results of another test, the Wechsler Memory Scale, Dr. Lonnecker stated that Credit's "general memory abilities were measured in the deficient range." (Tr. at 292-93). She elaborated, as follows:

> Immediate and delayed recall of verbally presented information is measured in the borderline range while immediate delayed recall of visually presented information and working memory abilities were measured in the deficient range.

(Tr. at 293). Dr. Lonnecker also performed the Minnesota Multiphasic Personality Inventory. (*Id.*). She commented that the results "suggest that the claimant may have approached the task in

---

[13] An "IQ" is defined as "a numeric expression of a person's intellectual level as measured against the statistical average of his or her age group." MOSBY'S at 847.

[14] The Wechsler Intelligence Scales are "a series of standardized tests used to evaluate cognitive abilities and intellectual abilities in children and adults." THE FREE DICTIONARY, *http://medical-dictionary.thefreedictionary.com*. After the appropriate test is given, "Verbal and Performance IQs are scored based on the results of the testing, and then a composite Full Scale IQ score is computed." *Id.*

somewhat of a defensive fashion," as follows:

> Profiles such as [Plaintiff's] are frequently generated by persons with poor tolerance to stress, limited insight, who may be somewhat rigid in their thinking style. Validity scales are significantly elevated suggesting that scales should be interpreted with caution.

(*Id.*).  Dr. Lonnecker also documented that the following took place during the examination:

> The claimant voiced a number of somatic concerns, [and the] objective personality assessment yielded a profile suggestive of some somatoform disorder.[15]  However given the claimant's health history as well as questionable validity on formal assessment, this should be interpreted with caution.

(Tr. at 294).  Ultimately, Dr. Lonnecker diagnosed Credit as suffering from "Depressive Disorder NOS" and "Anxiety Disorder."  (Tr. at 294).   She also gave Credit a GAF score of 55, and determined her prognosis to be "[f]air."  (*Id.*).

### Educational Background, Work History, and Present Age

At the time of the hearing, Credit was 47 years old.  (Tr. at 317).  She had graduated from high school, and had taken college classes towards an associates degree in business technology.  (Tr. at 317-18).  She had previous jobs involving clerical work, but the ALJ found that, for social security purposes, she had no relevant work experience.  (Tr. at 21, 319).

### Subjective Complaints

In her application for benefits, Credit claimed that she has been disabled, and unable to work, since March 3, 2006, because of "[c]ar accident/seizures/brain surgery."  (Tr. at 120-23).  She also stated that she is disabled due to complications arising from the brain surgery on July 1, 2006, because "the medication makes [her] sleepy"; as a result of "chronic back pain," "headaches," and

---

[15] A "somatoform disorder" is "any of a group of disorders, characterized by symptoms suggesting physical illness or disease, for which there are no demonstrable organic causes or physiologic dysfunctions."  MOSBY'S at 1513. "The symptoms are usually the physical manifestations of some unresolved intrapsychic factor or conflict."  *Id.*

"memory lapses"; and paranoia "because of the accident." (Tr. at 124).  In an updated application, Plaintiff reported that she was also suffering from depression, and that her "left side [was] weak ... especially [her] arm." (Tr. at 112).  She also stated that she could take care of her personal needs, explaining that "[i]t takes [her] a little while but [she] can do those things." (Tr. at 116).  In her request for a hearing before an ALJ, Credit stated that she was unable to work for the following reasons:

> I am not in shape to work.  My seizures come frequently.  I have memory loss.  My body doesn't function like it use to [sic].  My head hurts all the time.  Because of back pain, I can't sit or stand long.

(Tr. at 83).

At the hearing, Credit testified that she was involved in an automobile accident in March 2006.  (Tr. at 321).  She explained that the accident occurred as she was driving from the library, stopped at a yield sign, and was hit by another vehicle.  (*Id.*).  She told the ALJ that she was transported to the hospital by ambulance from the site of the accident, and that she was admitted for one night.  (*Id.*).  She testified that, at the hospital, she was told that she had suffered "a blunt trauma to the head," but not that it was "threatening." (Tr. at 322).  Credit testified that, in June 2006, she suffered from a seizure, and was hospitalized.  (Tr. at 316, 321).  She told the ALJ that she had never had a seizure before.  (Tr. at 316).  Credit testified that, while hospitalized, doctors discovered that she had a blood clot in her brain, and then she underwent brain surgery.  (Tr. at 316, 322-23).  She testified that, following her release from the hospital, she returned to the hospital's neurosurgery clinic for follow-up treatment.  (Tr. at 232).  Credit testified that she had two seizures following her brain surgery, but that she has not had one since December 2006.  (Tr. at 316).  She attributed the lack of seizures to her use of anti-seizure medication.  (*Id.*).

16

Plaintiff testified that, following the brain surgery, she began having memory problems.  (Tr. at 324).  She told the ALJ the following:

> It was -- after my surgery was when I really started having the problems where I - my mother and my family would ask me certain things and I couldn't remember.  I just couldn't remember some of the things that had happened in my life and something could happen probably [sic] had happened a year ago or whatever and I would try and try.  Some of the things I could remember and some I can't.  ... There's a lot of things I don't remember.

(*Id.*).  Credit testified that, during this period, she also learned that she suffered from diabetes, hypertension, and "heart problems."  (*Id.*).  Plaintiff testified, as well, that, in June 2008, she went to the doctor because her chest felt tight, she had a headache, and her "blood pressure was enormously high."  (Tr. at 325).  She reported that she was "forgetful," that she had difficulty concentrating, and that she was experiencing pain and fatigue.  (*Id.*).  Credit told the ALJ that her high blood pressure was treated with increased medication.  (*Id.*).  She also testified that she took nitroglycerin for an irregular heartbeat and chest pain.  (Tr. at 326).  She testified further that she takes medication to help her sleep, but that she often gets no more than three hours of sleep at night.  (Tr. at 326-27).  She also testified, however, that she sleeps during the day.  (*Id.*).

In addition, Credit testified about her mental state.  (*Id.*).  She told the ALJ that she is prone to crying, sometimes two or three times a day, and that she lacks interest or motivation to do things that she used to do.  (*Id.*).  She stated, "I cry a lot when I start thinking about what happened in my life."  (*Id.*).  She added that, since the accident, "[I]t's just like my life has just been a downhill spiral."  (*Id.*).

Credit also testified about her personal life.  She told the ALJ that she has one child, a 26-year-old son, who lived with her until the previous year.  (Tr. at 318, 327).  She testified that her niece sometimes stays with her, and that her mother "is there a lot."  (Tr. at 327).  Plaintiff testified

17

that she drives a car, usually just to go to church or to go grocery shopping.  (Tr. at 328).  She stated, "I don't drive as much as I used to since my accident because I'm paranoid."  (*Id*.).  She further testified that she has relatives who will drive her, and that members of her church sometimes help her pick up groceries.  (*Id*.).  Credit testified that she cooks at least once a week, and that she does her own laundry, uses a dishwasher, and dusts.  (Tr. at 329).  She testified that she does not do her own yard work.  (*Id*.).  Credit told the ALJ that she has difficulty getting along with people, because she feels depressed, and that she does not like to be around a lot of people.  (Tr. at 331-32).  She testified that she is involved in her church, and that one of her regular activities is feeding and handing out blankets to the homeless.  (Tr. at 331).  Plaintiff stated that she regularly hosts a Bible study class in her home.  (Tr. at 332).

### *Expert Testimony*

At the hearing, the ALJ also heard from Cecile Johnson, a vocational expert.  (Tr. at 333). The ALJ posed the following hypothetical question to Ms. Johnson:

> Q       Then assume with me a person of the same age, education and vocational background as the claimant and then further assume with me the following, hypothetical number one.  This person could work at the level of light as defined by the Labor Department's <u>Dictionary of Occupational Titles</u> and is also limited to simple, repetitive, one, two, three step tasks.  She would have only occasional interaction with the public and co-workers, no working at unprotected heights or around dangerous machinery.  Is -- are there any jobs in the economy such a person could perform?

(Tr. at 335).  Johnson replied that such a person could perform "light, unskilled" work, such as "mail clerk," "office helper," and "office cleaner."  (*Id*.).  She testified that the hypothetical claimant could perform these jobs even with the added restriction that work must be done "at a nonforced pace." (*Id*.).  The ALJ then asked if the same hypothetical person could maintain employment if she was required to take three to four unscheduled breaks, 15 minutes in duration, on a daily basis.  (*Id*.).

18

Johnson responded that she would not.  (*Id.*).

Plaintiff's attorney then posed the following hypothetical question to Johnson:

Assume that the hypothetical individual could not remember sufficiently to perform one or two step tasks, would there be any jobs in the national economy such an individual could perform?

(*Id.*).  Johnson responded, "No, that ... would interfere with productivity."  (*Id.*).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he concluded that Credit suffers from a "status post head injury resulting from an automobile accident"; "depression, not otherwise specified ["NOS"]"; and an "anxiety disorder," and that those conditions are "severe."  (Tr. at 17). He found, however, that Plaintiff did not have an impairment, or any combination of impairments, which meets, or equals in severity, the requirements of any applicable Listing.  (*Id.*).  The ALJ further found that Credit had the residual functional capacity to perform work requiring a "light" level of exertion.  (Tr. at 19).  However, the ALJ added the following further restrictions:

[S]he is limited to one to three step tasks and occasional contact with co-workers. The claimant must also avoid working at unprotected heights or around dangerous machinery.

(*Id.*).  Next, the ALJ found that Credit had no past relevant work experience.  (Tr. at 21).  He concluded, however, that she was capable of performing such jobs as "mail clerk," "office helper," and "office cleaner," and that those jobs exist in significant numbers in the local and national economies.  (Tr. at 21-22).  Ultimately, the ALJ concluded that Credit was not disabled, and he denied her application for SSI benefits.  (Tr. at 22).  That denial prompted Credit's request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id.* A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Boyd*, 239 F.3d at 704.

From her motion, it is clear that Plaintiff's main challenge is to the ALJ's findings about her mental condition. (*See* Plaintiff's Motion at 5-8). She claims that the ALJ "failed to give proper weight" to Dr. Lonnecker's findings. (*Id.* at 5). A review of the ALJ's decision, however, shows that he did, in fact, fairly address and evaluate Dr. Lonnecker's opinion. For instance, the ALJ pointed, specifically, to several of the psychologist's findings regarding Credit's cognitive abilities, thought process, intelligence, and social abilities. (*See* Tr. at 17-21). In determining that Credit's concentration and memory were "intact," he referenced Dr. Lonnecker's findings that Plaintiff's memory was deficient, but that she could remember six digits forward, seven digits backward, and the past four presidents. (Tr. at 18, 20, 290-91). Further, the ALJ expressly addressed Dr. Lonnecker's finding that Credit had a GAF score of 55, noting that it was the same score that had been assigned by another mental health professional, Ms. Latino. (Tr. at 20). Notably, in his decision, the ALJ stated that he "generally concurred" with the findings of the state agency medical examiners, and that his RFC was consistent with the "reports of the consultative medical examiners." (Tr. 21). Dr. Lonnecker was one of those consulting "medical examiners." (Tr. at 20). For these reasons, there is no merit to Plaintiff's argument that the ALJ failed "to give proper weight" to Dr. Lonnecker's findings.

Plaintiff also contends that the ALJ failed to take into account her mental limitations and her memory deficits in determining her residual functional capacity. (Plaintiff's Motion at 5). Again, however, the written decision shows otherwise. The ALJ devoted two pages of his decision to the issue of Credit's RFC. (*See* Tr. at 19-21). Almost half of that discussion addressed Plaintiff's alleged mental condition. (*See id.*). In his discussion of her RFC, the ALJ acknowledged, and apparently accepted, medical findings that Credit suffered from depression and anxiety, that she avoided extensive social interaction, and that her memory was deficient. (Tr. at 20). In addition, he addressed the GAF scores assigned to Credit. (*Id.*). In addition, he referred to Plaintiff's own testimony regarding her mental state, including memory, concentration, and social concerns. (Tr. at 20-21). Clearly, the ALJ considered Credit's mental limitations and memory in determining her RFC.

Further, the ALJ's decision on Credit's mental limitations is supported by other medical evidence in the record. It is well settled that, on review, the court can consider only whether the ALJ's decision is supported by substantial evidence, and whether the proper legal standards were applied. *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452. "Substantial evidence" is "such that a reasonable mind might accept it as adequate to support a conclusion." *Randall*, 570 F.3d at 662. In this case, Dr. Lonnecker found Credit to be alert, characterized her speech to be "within normal limits," and found her thought process to be "coherent," "logical," and "relevant." (Tr. at 289). She stated that Credit's "social functioning is limited but adequate." (*Id.*). She also noted that Credit was able to summarize her mental health history with fair reliability. (Tr. at 288). Dr. Lonnecker found, as well, that Credit's "[i]mmediate and delayed recall of verbally presented information [was] ... in the borderline range." (Tr. at 293). Further, Dr. Lonnecker concluded,

specifically, that Credit's memory limitations would not preclude her ability to understand and remember simple tasks, and would pose only a mild limitation on her ability to understand and to remember complex tasks.  (Tr. at 296).  The ALJ's decision is also supported by Dr. Buell's findings.  Among other things, Dr. Buell, a neurologist, commented that Plaintiff appeared to have "no problem understanding or concentrating," and that she had "no difficulty answering questions." (Tr. at 209).  The records from Ms. Latino lend additional support to the ALJ's decision, because, although she diagnosed Credit as suffering from a "major depressive disorder," she reported that Plaintiff had a GAF of "55" and recommended only that she be "evaluated" as a candidate for antidepressant medication.  (Tr. at 276-77).  The ALJ's decision is further supported by Plaintiff's own testimony.  For instance, Plaintiff reported to Dr. Lonnecker and the ALJ that she is able to cook, clean, drive, read, pass out sandwiches to the homeless, and even host a Bible study group in her home.  (Tr. at 20).  Also, while Credit testified that she has memory problems, the difficulties she describes do not necessarily impact one's ability to work; she states simply that, when asked about "things that had happened in [her] life ... [s]ome of the things [she] could remember and some [she] can't."  (Tr. at 324).  Moreover, there is no evidence that Plaintiff ever sought professional treatment to help with depression and anxiety, although it was recommended.  (*See* Tr. at 277).  In this case, then, there is sufficient evidence that Credit's impairments do not render her "disabled," for purposes of the Social Security Act.

Plaintiff's next complaint is that the ALJ erred, because he did not include her mental and memory limitations in the hypothetical questions he posed to the vocational expert.  (Plaintiff's Motion at 5).  The record belies this argument, however.  At the hearing, in his first hypothetical question, the ALJ asked Ms. Johnson to consider an individual with limited cognitive abilities, who

needs "simple, repetitive, one, two, three step tasks," and who needed limited interaction with others. (Tr. at 335). In answering that hypothetical question, Ms. Johnson addressed the proposed claimant's ability to retain employment if she could work only at a "nonforced pace." (*Id.*). All of these factors relate to memory and cognitive ability.

In her motion, Plaintiff also challenges the ALJ's consideration of her physical impairments. (Plaintiff's Motion at 5). She argues that the ALJ erred because he "failed to make severity findings on all of Plaintiff's impairments specifically, her diabetes." (*Id.*). She notes that "[a] Discharge Summary from Ben Taub Hospital dated July 3, 2006 indicated, the patient will be discharged with anti-seizure medicine, blood pressure and diabetes medications." (*Id.* at 22). As Defendant points out, Dr. Daniel also made a reference to diabetes, noting that Credit had a history of "diabetic neuropathy." (Tr. at 286). Significantly, Plaintiff did not complain about diabetes in her application, and only briefly touched on the issue at the hearing. Further, there are no medical records, through the date of the hearing, that suggest that Plaintiff was suffering from any complications due to diabetes.

In addition to the issue of her diabetes, Credit also complains that the ALJ did not make a specific finding about "[m]ultifocal chronic encephalomalacia." (Plaintiff's Motion at 22-23). She notes that the condition was "documented by objective medical testing as shown by the results of a CT scan of her brain." (*Id.* at 22; Plaintiff's Response at 6). Aside from the referenced CT scan results, however, there is no mention of the disorder in the medical records. (*See* Tr. at 232). Indeed, when Plaintiff was discharged from the hospital, she was considered to be doing well. (Tr. at 227). It is well settled that, even if "[medical] records refer in passing to" a condition suffered by a social security claimant, that alone does not establish a disabling impairment, or suggest that

it significantly impacts that person's RFC.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).  In this case, the record contains no more than a brief mention that Credit suffers from diabetes and from encephalomalacia.  Under these circumstances, Plaintiff has not shown that the ALJ erred.[16]

Finally, it is well settled that, even if an ALJ erred, his decision will not be disturbed unless the complaining party was prejudiced by the error.  *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981).  In a social security benefits case, an individual establishes prejudice by showing that, absent the violation, a different result might have been reached.  *See Ripley*, 67 F.3d at 557.  Here, there is simply no evidence that might compel the ALJ, on remand, to find that Credit is, in fact, disabled, as defined by the Act.  For that reason, Credit has not demonstrated that she has been prejudiced by the ALJ's actions or omissions.  *See id*.  As a result, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion for Summary Judgment be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

---

[16] Arguably, the ALJ did consider encephalomalacia.  In his decision, the ALJ found that Credit's "status post head injury resulting from an automobile accident" was "severe."  (Tr. at 17).  The condition of  "encephalomalacia" is alleged to have resulted from that head injury.  An ALJ is not always required to give a "point-by-point" analysis.  *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 2nd day of September, 2011.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**